Good morning ladies and gentlemen. Our first case of the morning is a case number one one seven three four one Henry D.L.H. jr. a minor people the state of Illinois versus D.L.H. jr. Are you ready to proceed? Good morning your honors. May it please the court counsel. I'm assistant attorney general Brian McLeish on behalf of the people of the state of Illinois. There are a number of issues floating around but there are only three presented to this court. The first is whether respondent statements to the second is whether his statements were coerced and the third is if for any reason those statements should not have been admitted at the discharge hearing the error was harmless beyond a reasonable doubt. Turning first to custody it's useful to separate these interviews and in the first interview all of the factors clearly weigh towards the finding that respondent was not in custody. The location, length, time, mood and mode of interrogation were all fine. They were short. The interview was friendly. The officer even asked permission from respondent and respondent's father to ask the initial questions to which respondent agreed. The officer was there by himself. He was in plain clothes and while he had a gun it remained in his holster. He never showed it. Respondent's father was present throughout the interview, sat next to respondent, even interacted with respondent during the interview and the told respondent that respondent was not under arrest and that he was not going anywhere. The only factor that weighs towards the finding of custody is respondent's age and that factor alone is not enough for the court to find that this interview was custodial. Counsel, what about his diminished capacity? Is that relevant? That is not relevant to the custody analysis because his capacity is not objectively apparent to the officer. But the fact that the diminished capacity was there, would that affect the voluntariness of his ability to understand what was being said to him? It is relevant to the voluntariness analysis, yes, Your Honor. However, it's not relevant to the custody analysis. So just looking at custody and whether Miranda warnings were necessary and whether this was a custodial interrogation, the diminished capacity is not relevant under United States Supreme Court precedent unless it's objectively apparent. When we move to whether the statements were coerced, then the respondent's mental abilities are relevant to the analysis. In the second interview, again, all the factors except respondent's age weigh towards a finding that this was a custodial interrogation. And the officer constantly reminds respondent that the respondent's father is going to remain in the room. He's still there. So you still have the concerned adult present. The officer, again, gives the Miranda warnings, again, explains that the respondent can end the interview at any time. And so, yes, both of these interviews are not custodial. And none of respondent's statements were coerced. I think it's useful to set up the law here. So the standard for a voluntary confession is not the same as the standard for an intelligent and voluntary waiver of Miranda rights. A confession must merely be voluntary, and that just means that it can't be coerced. The person making the statement has to make it of his own free will. And, again, all the factors except respondent's age and intelligence, in this case, were not coerced. The length of the questioning and detention were both, well, there was no detention. Respondent was not detained. He was free to end the interview at any time. Did the diminished capacity have any relevance to his ability to understand he was able to leave at any time? It is relevant to the analysis, yes, Your Honor. However, the detective gave very clear instructions, and the words were, if at any time you, respondent, or you, your father, want to end this, you just say the word, and it's as easy as that. And that's something that even a nine-year-old could understand. Yes, Your Honor, because he, the, Dr. Cuneo's testimony, or Dr. Cuneo's report was that respondent had a mental age of, I believe, seven and three-quarters. And even a seven-year-old knows that when the officer says, you can end this at any time, all you have to do is say, Sean, we're done here, and that means we're done. That is something that a seven-year-old understands. Yes, Your Honor. What about the fact, I understand the detective told the respondent repeatedly that he wouldn't be taken away, and he wouldn't go to jail. What impact does that have on the custodial analysis? On the custody analysis? On the custody analysis, I think that makes it very clear that he's not in custody, because he's telling respondent that you are free to, you know, once we're done here, you're not under arrest, you're not under arrest now, you're not going to be under arrest. Under the voluntariness analysis, and the question is whether that is some sort of trickery or some sort of lie to induce a confession, that statement was not, you know, if you just tell me the truth, then I'm free to go. Then I'm not going to arrest you with the implicit threat that if you, you know, if you don't tell me what I want to hear, then I'm going to arrest you. That, you know, if the officer had said that, it's obviously a much tougher case. But the officer just explained, you're not in trouble, I'm here to find out the truth, and did not push respondent when he made those statements in either direction. So it did not change respondent's free will to either to tell the officer the truth or not. You know, some nine-year-old children still believe in Santa Claus. Was there some obligation or shouldn't there be a heightened requirement that the officer conducting the interrogation make some effort to determine the child's level of maturity? The officer did ask whether respondent had any special needs, and the officer... Didn't the father say he had asthma? I believe so. That was it. And so... And was there any follow-up on that? No, Your Honor. I don't think there was any follow-up to the response that he had asthma. However, the officer can also gauge by his interactions with the respondent, you know, the respondent's, you know, mental abilities. And the officer simplified things, I think, the same amount that he would have done, I mean, of a child of a very young age. And whether it's a nine-year-old or a child with the mental age of an old seven-year-old, things need to be simplified dramatically, and the officer did that here. The officer, you would, you know, an officer even interrogating a 13-year-old would probably not say, listen, all you have to say is we're done here and we're done. It's as easy as that. That's probably not something an officer's likely to say to a 13-year-old even, and certainly not to an adult. This nine-year-old was found unfit for trial. He arises in a not guilty discharge hearing. Does the fact that he was found unfit fit into our analysis? No, Your Honor. It's, there are different, again, different tests. Even the test for whether he could knowingly and intelligently waive his Miranda rights, which would be closer to being fit for trial, is, there are different tests. And here, the only thing that he has to know is that he didn't have to talk to the police officer. Whereas, you know, when you're found unfit, whether in a fitness evaluation, you have to know the role of your attorney, the role of the judge, the role of the prosecutor, what plea negotiations are. There's significantly more knowledge that you have to obtain, and it's not surprising that a nine-year-old wouldn't understand those things. However, I think it is clear that a nine-year-old can understand when the officer says, you don't have to talk to me, when the officer asks permission to ask him questions, and when the officer says, you say the word and we're done, that the nine-year-old would understand that. Was he found unfit because of his age or because of his low functioning? I don't know that those can be separated. I think he was, Dr. Cuneo did a comprehensive evaluation and found that this particular child was unfit. He remains unfit, as far as the last record update. So he remains unfit for trial, even though he's now two years older. So I think it's safe to say that it was not strictly because of his age at nine years old. So moving to the actual facts of the interview for voluntariness. Again, it was a short questioning session, two short questioning sessions. It's about the length of time that a nine-year-old is expected to sit in math class. The Miranda warnings, we're not arguing that Respondent knowingly, intelligently waived his Miranda warnings, but the Miranda warnings, the important ones for the voluntariness analysis were, again, that you have a right to not talk to me, and Respondent answered that and he understood what that meant. How do you know that? That was one of the questions in which Respondent did explain the right back to the detective. So the truth? Did he say that? No, Your Honor. What were the words he used? What were the words the Respondent used? I will have to paraphrase, but he said, it means I don't have to say nothing. I believe those were his exact words. And that's in the record, and it's also in the first few minutes of the interview, so you can double check me on that. But he did explain back to the officer what the right to remain silent meant. Regardless, even if these statements should have been suppressed, the error was harmless. These videotaped statements were probably the least inculpatory evidence presented at trial by the State. The State's case, the star witness for the State was the DCFS investigator who interviewed Respondent within 12 hours of the victim going to the hospital. She asked him very open-ended questions. Where were you when this happened? What happened? And Respondent provided all the information. He informed her that he hit the victim twice in the head and once in the side. He demonstrated those punches. He also, after the interview, they returned to a room where the other children were, and the investigator asked the three-year-old, what happened to your lip? And the three-year-old did not respond because the three-year-old was nonverbal, but Respondent chimed in that I hit him in the lip on the same night that he hit the victim. You also have testimony from Joyce Wilborn, the grandmotherly figure who said that she treated Respondent just as another grandkid around the house. She was shocked to hear that Respondent had hit the victim. She asked Respondent directly, and he acknowledged that he'd hit the victim to her. And that was even before the DCFS interview, so that was, again, within 12 hours of the victim going to the hospital. That was in the early morning hours, I believe before daylight even. So the two closest-in-time statements were that he hit the victim that night. You also have the testimony from the autopsy technician about the extent of damage to the victim's skull and brain.  And when you add in these videotaped statements, it's a lot of Miranda warnings. It's a lot of denial and stating that the 11-year-old was the one who did the hitting. And then at the very end, it was a statement that Respondent hit the child once in the side. And the demonstration, again, hitting the child once in the side. And the demonstration showed that Respondent's statement was that the 11-year-old did all of the damage. Most of Respondent's arguments about harmless error actually are unrelated to the videotaped statements. And I think that is telling that there are all these other issues on the side, but the videotaped statements don't play into that at all. And, in fact, Respondent uses the videotaped statements as evidence of Respondent's innocence in combating some of the other issues and attacking some of the other state's witnesses. And I think that goes to show how exculpatory parts of these interviews were. And ultimately, even the moderately inculpatory parts, they didn't fit the state's case and they were, at best, cumulative. So, for those reasons, we ask that this Court reverse the decision of the Appellate Court and remand for further proceedings in the Appellate Court. Thank you, Your Honor. Thank you. I apologize to the Court for bad cold, bad timing on today, but I'll get through it with the medication I have. Honorable Court, State, New America. My name is Bill T. Walker. I represent the juvenile here, the minor. To correct the record, I was not appointed by anyone. This is pro bono at the request of several people who asked me to intervene in this case. And I have, since day one, been the case all the way through today. People ask why. You look at the record, my client, I can feel for him. He went through life like I did, mental deficiencies, scapegoat, and he grew up very poor. And that's why we're here. Now, custodial, yes, it was custodial. Was it voluntary? No, it was not voluntary. It was harmless? No, it was not harmless. Custodial. The police officer himself, it comes up that the State says he didn't know the deficiencies of my client. He knew it within the first four minutes of the video, and you can see it in the video. And what he did, he asked my client to initial the Miranda warning, which I've had done hundreds of times for clients. A little line, you initial each one that you've been advised to that, and you understand it. My client didn't initially sign his name. His father tried to correct him on the thing. My client is 7.76 mental years of age, according to Dr. Cuneo's report, which is in the record. 7.76 is what he tests out. My client did not understand what the word initials mean. If he doesn't understand what the word initials mean, how in the world does he understand Miranda warnings? In this court, the State wants you to believe that he does, and it's not relevant. That is an objective finding by the officer on the first session at the very beginning. He sees my client does not understand what the word initials mean. That's very objective. They argue it's short. Ladies and gentlemen, we're- Does that, Mr. Walker, does that go to custody or voluntary? I think it goes to both, Your Honor, because I think it sets the state of mind of this child. Everybody tries to overlook he's 7.76. He's special ed. He's very limited in his understanding. And, again, back to the scapegoat part, in the record- Sorry, are you saying that mental capacity of 7.76, that a respondent of that mental capacity can never be in custody? No, sir. Or never be not in custody, rather? No, sir, I'm not saying that. I'm saying that my client at 7.76, with his mental capacity, you have to look at what he understands and what he believes. Dr. Cuneo said he didn't understand what a defense was. He didn't understand what anything was. He didn't know how many hours were in a day. He didn't know how many days in a week. I mean, this, you're talking about somebody that's highly restricted in what he can understand and do, yet we're supposed to believe that he can understand that he's in custody or not in custody. His father, during these things, is told to sit back on one occasion. He's told this. In random warnings, he's told, you have a right to be silent. Then, don't be quiet on me. I've got two law degrees, Your Honor. I don't know what that means myself, and I've got three and a half decades of experience in trying criminal cases, civil cases, and somebody tells me I have a right to be quiet, but don't be quiet on me, and I'm 7.76 mentally, nine years chronologically. That's confusing to me at 66 years old with two law degrees. I think it's very confusing, and the child doesn't understand. And it's not even a child. It's an adolescent, very adolescent. Father, in this case, sat back. There's a bump on the law. He didn't assist the child in any way. The videotape is part of the record. Both of them are. We looked at them extensively in the courtroom. The judge did. I'm not telling the court to look at it, but I think if each individual justice looked at that videotape, you would see the mode of interrogation and its interrogation. You would see the conduct. My client's sitting there rubbing his head, trying to figure out what's going on. This is not even above his head. It's not even in his universe where he's at whatsoever. The officer had a gun. I'm sure if you ask most people that are nine years old or younger, the officer's sitting there with a gun, and you see the gun. He doesn't have to remove it from his holster. He's got a gun. He tells the father not to leave. He tells my client, the father can't leave. Your father can't leave, and you're nine years old or 7.76 in mental capacity. Your father's not leaving. How are you leaving? My client was in custodial. The police officer, you look at the legislature, and you look under the videotaping, and you look at what the intent was from the legislature. You go back, and you see that the individual. Sorry for the delay. The reasoning officer took the video. The reasoning officer's there, and you look at the officer's testimony that I elicited during the trial from the transcript. My client was the only suspect he ever had. They didn't investigate anybody else. He had his mind. My client had done it. If you look at the questions to my client, my client's denied five different times that he did anything. The officer keeps saying, basically, I know you did it. You did it over and over. Just confess to me. Nothing's going to happen to you. You're not going to go to jail. You're not going to leave. All this, that, and the other. He has taken an investigation. Quote from TV, the officer is. He says he's a juvenile trained officer. He doesn't ask the kid. He says juvenile trained officer. He gets down on his head level with the kids. That's not juvenile. You ask these kids questions. My kid, my child, my client is 7.76. You ask and explain in more detail. My client was in custody without any question whatsoever, under any test, under any case that this court's had. Justice, you asked earlier what did my client say. On page seven of our brief, at the video one, at 545 Intuit, when the officer asked my client whether he understood the right to remain silent, what it meant, my client said, it means I don't have to say anything. And it goes on. The detective asks, do you understand that? And my client said, hmm, at video one at 555 on the video. The time is not the time of the day. It's the time into the video itself. My client understood. The officer says he has the right to be silent. But then he comes back and says, don't be quiet on me. The state tries to construe that meaning as something else. I ask each justice here and Justice Freeman to consider what you would do in a case like that if you were nine years old. I've thought about it. I've tried to go back and be nine years old at 7.76. What I thought about, I wanted my tray the same color at lunchtime as the girl I liked in the classroom. That's the type of stuff I thought about at nine years old. Whether or not you look at this, Illinois Statute 705.405.1-4.1.5 says, any interrogation during which a reasonable person in the subject's position could consider himself or herself to be in custody, and during which a question is asked that is reasonably likely to elicit an incriminating response, is what the legislature has put down as far as their definition of custodial interrogation. If this case doesn't meet that 100% when you look at that tape, both of them, video one and video two, I tell you, it does 100%. I'm not trying to make it a gray area or stretch it. It's very clear that the legislative definition in that statute is met. This is a custodial interrogation. I've asked all along, how about going out and doing an investigation? At the end, I'm going to ask you what we want. We want justice. We want the person to kill this kid in prison. That's what we want. We want this person convicted and put away, and it's not my client whatsoever. The medical evidence, if you look at that, to say it was grotesque, the stuff that's in the record, is putting it mildly. You know, you look at it, and the state says, well, my client hit a couple times here, once there, this, that, and the other. You take all that they say from any statement from anybody, where's the cause for the bilateral retinal damage their expert found? Bilateral retinal damage. That's from shaking. That came from their expert. It really wasn't an expert, but the judge overruled me. Their pathologist found bilateral retinal damage. They're saying my client said he hit the child twice in the forehead, or once in the forehead, once in the eye, once in the side. How do you get bilateral retinal damage on a 14-month-old child from a blow to the one eye? You're not going to get that. You've seen boxers beat up their faces. Look at this picture. There's tons of pictures of this baby's face. This baby looks like an angel when it's laying there. Look and see if there's any bruising in the face. You'll find none. Any swelling in the face, you'll find none. If my client beat the heck out of this kid to kill the kid, where is the swelling and everything? When you look at the medical evidence brought on by the state, who's the only one presenting medical evidence, and look at what the pathologist said, it's internal damage, not external. For my client to beat the child, you would have to have external damage to cause it. And I allege it's impossible to have bilateral retinal damage from one hit to one eye. You're going to have to have both. Counsel, you're making quite an eloquent argument on the facts, but we're going to be creating precedent in writing this case. So what's the rule that you would like this court to promulgate? I would argue, Your Honor, in the legislature they say in 705 ILCS 405-5-170 that if you're under 13 years of age, you must be represented by counsel during the entire custodial interrogation of the minor. When I asked the officer, in the transcript it shows, would he have done anything differently if he had observed what I observed in the tape, in the interview, and he said he would have done it differently. I think if a lawyer was present, it would protect the interest of the child. I think a lawyer doing their due diligence would understand what the educational level of the child is. I think a lawyer doing their due diligence would have had the child checked out before with a clinical psychologist. So are you saying that the statute, as I read it, says custodial? Custodial interrogation, correct. Okay. You seem to be arguing that any time an officer questions a child of this age, they ought to have an attorney. Is that what you're telling us? I'm not saying that, Your Honor, because when you say absolute any time, it's tough. I believe under this circumstance, and I believe under most circumstances, when you have a child, as in my client's case, they objectively see right up front they don't understand a word like initials. And when you look at the tape and he's rubbing his head, when he's asked about the other Miranda warnings, he gives no response back that's even coherent. Then I think what you have to understand there is in that case, yes. I would argue yes. I think the court should go further and say if a child is under 13 years of age in the state of Illinois, they are going to have counsel present for any interrogation by the police. I think I'd rather protect the child than let the child go to the opposite end. That's what we have in this case. We're taking this court's time, we took the 5th District's court time, arguing over something here that should not have taken place to start with. And I get on my soapbox, but I really believe that there is a murderer walking around St. Clair County right now, and I think killing a baby like this is not right. I think it should be taken care of. But I'm asking this court to rule in favor, set a case out saying that if the child is under 13, that he should have an attorney present for interrogation, specifically if the child has limited capacity for it. Because, again, as the court said earlier, 7.76, they still believe in Santa Claus, still believe in the Easter Bunny. This child, don't forget, too, they want to say, well, he confessed to DCFS, so it's harmless. If you look at the transcript and look at the reports of everybody that's in there, the adults, I didn't say parents because this child lost his grandmother and his mother at age three within 60 days of each other, the adults in this house advised the kid to lie when he was asked questions, and the kid lied. And he reported to people before all this started that he was told to lie to DCFS in order to protect the adults. That's how, at 7.76, that's how pliable his brain is for these people. The adults are telling him, go lie to the people, that protects the adults. Because in this case, the record's very clear. An 11-year-old calls the family and says there's something wrong with the baby. They stay where they're at for 90 minutes more. Then what happens when they come home after that 90 minutes? They go to bed. The record's very clear. They don't check on the baby whatsoever. They go to bed. And then later on at 2 a.m., get up and they hear some noises, gurgling from the baby, and check on the baby. Mr. Walker? Yes, sir. How do you address, I think you started to address it, maybe with that your client was told to lie, but how do you address the state's argument with respect to harmless error that respondents, your client's statements, that two detective addends were largely exculpatory and there's only one lone inculpatory statement, according to the state, that was cumulative of the testimony of Norman and Wilborn and Dre? And I believe that was the dissenting justice's, Justice Wexton's opinion as well, right? Yes, sir. To start with, for the three, for the 11-year-old child, he admitted he was told to lie and he lied. So you don't know when he's lying and when he's not lying, when he says what happened. Plus, Missouri Department of Children's Services in Illinois and Dr. Cuneo say that he's the one that's beat up and punishes my client as a scapegoat all the time. My client said the adults told him to lie to DCFS. There's no contradiction showing the opposite of that. Joyce Wilborn is not even related to my client. He's related to the mother who stayed out 90 minutes later, who went home, went to bed, and then got up later on to see the kid. She uses my client as a scapegoat. And I disagree. I was there. I watched the tape. I watched Detective Sean Adams testify. I watched the judge in the courtroom watching Detective Adams. I think it's not cumulative. I think it's the fact of looking there. And if you look at the test, Your Honor, of this court, in order for an error to be harmless, a reviewing court must be satisfied beyond a reasonable doubt that the error did not contribute to the defendant's conviction. And you only have the record, and I understand that's what you've got to rule on, but even if you just look at the record, you will see that's the part, in my opinion, that there's no way beyond a reasonable doubt you can focus and say that the judge did not look. A good example is I get the opinion, and I'm looking for findings, because I knew what the opinion was going to be. I knew I had to appeal it to the Fifth. There's no findings within the decision. It's all factual. There's just no findings. He never found anything within the order itself, if you look at the lower court's decision. That's a problem, too, in this situation, that I feel the State's incorrect in that, that the judge relied heavily on the detective's two videos that we saw over and over and the detective's opinions and testimony in this case. And I feel that there's no way you can – it's sort of like when the bell rings, you can't unstrike the bell. The judge heard that. If you look at the testimony in the transcript, the judge, when the State put on their – for, quote, board-certified forensic pathologist, and she testified, the court found her as an expert. I jumped up and said, I get to voir dire her. I voir dire her, found out she had never been a board-certified forensic pathologist in her life. She was a student in that. The judge went ahead and kept her as a, quote, expert by the court, as a board-certified forensic pathologist. The court, from that, I think the record shows that the judge is looking at what comes from that – comes from the side of his bench there being the witness stand, and I think he builds a lot of credibility to that. I can't get in the judge's mind. You can't get in the judge's mind as far as what he was thinking, what he did. And what's even worse, he didn't make findings so we can see what he was even thinking about or how he was thinking about it. And to me, right there, I think that's error, that he's not putting it down. Thank you. Thank you very much. Counselor, your time has expired. Sir? Thank you. I would agree with Mr. Walker about one thing, and that is I would urge the court to watch both videos in their entirety, and they will show that the interviews were not custodial and the statements were not coerced. I'd also like to look at a couple individual statements, the don't be all quiet on me, which Respondent has relied on heavily. It was not made when the detective advised Respondent that he had a right to be silent. He gave that warning. He then explained that the statements Respondent made could be used in court against him, and the officer then said, now, if you have any questions, don't be all quiet on me. Ask me, ask your dad. I think within the context of an interview, yes, an old seven-year-old or a nine-year-old with the mental abilities of an old seven-year-old would understand that don't be all quiet on me in that context means if you have a question, pipe up. Respondent makes a couple comments that he was a scapegoat. That was not presented, that was not Dr. Cuneo's testimony. That was a finding from Respondent's treatment providers based solely on Respondent's statements to the, well, I shouldn't say based solely, based primarily on Respondent's statements to the treatment providers. That was not Dr. Cuneo's opinion. It came out on cross-examination that someone had called Respondent a scapegoat, but that was no one's testimony at trial. That was not Dr. Cuneo's opinion. Could you explain, I'm not sure I understand, how does this statement get into the record? Dr. Cuneo was testifying about, it was during a hearing on, I believe, fitness. Dr. Cuneo was testifying, Respondent's counsel was cross-examining and pointed to this statement in the treatment provider's account that Dr. Cuneo had referenced in his report, and Dr. Cuneo never endorsed that statement. He just explained what he thought it meant. Mr. McLeish, what about Mr. Walker's argument that the child was told by adults to lie? Is that, do you have a different, I'm not suggesting how you look at it. I just want to know if there's more context to that. Is that factually clear in the record? Respondent's statement was that the adults told him to lie in the initial interviews to protect them. They did not tell him to lie and claim that he did it, and eventually the only statements we have from him are that he did it or that Drayquan did it. And there's no real reason for him, if Drayquan had done it, lying about that doesn't protect the adults. So it's not clear why that lie would work. However, it's entirely likely that the adults were coaching both Respondent and Drayquan. Drayquan testified that Respondent's father told him, don't tell anybody that you saw Respondent do it because you don't know what happened, so don't say that you do. And during the initial videotape statement, the first interview, Respondent's father says, you need to know that you're putting yourself at risk here. If you did not do it, then you did not do it. Now that is not necessarily telling Respondent to lie, but it also shows that he was participating in that first interview and he was not sitting on his hands. So it's entirely possible that Respondent was told to lie. However, there's no reason to think that he was told to lie to his grandmother. There would have to be a lot of bad actors for Respondent's theory of the state going after a nine-year-old when another person committed the murder. Some of the adults would have to be bad actors. The grandmother, we figure, Joyce Wilborn, would have to be a bad actor and lie on the stand about what Respondent told her. That seems unlikely. That seems quite unlikely. Counsel? Yes, Your Honor. With regard to Justice Kilbride's inquiry about lying, if the child is diminished and he was told once to lie, how can we speculate as to when he was telling the truth? So, I mean, that's fundamental, I think, is that we can't really count on when he was telling the truth and when he was lying. Is that right? Otherwise, we're just speculating. I think it's speculating to think that he was lying all the time. We have two statements directly after the child went to the hospital. Within 12 hours, a statement to a DCFS investigator who is a completely independent person and also a statement to the grandmother figure. The statement to the DCFS investigator is also corroborated by the Respondent's statement to the DCFS investigator that he hit the three-year-old. And there's no reason to think that he was told to lie about that. So that's a corroborating detail. We also have Draquan's consistent statements throughout, both to the DCFS investigator and at trial, that he didn't see what happened. He called his parents immediately after. And so we have one person who's told consistent statements throughout. We have Respondent who initially claimed responsibility and then after a period of time changed his story. And so, again, this is why the videotaped statements are harmless because they were the later statements. They're exculpatory. And so they just don't add anything to the State's case. With regard to Respondent's mental abilities and the initialing, Respondent doesn't have to know the difference between initialing and signing his name. And there's no evidence in the record that an average intelligence nine-year-old would know the difference between initialing and signing his name. Respondent had to know two things. For custody, he had to know that he could end the interview. He knew that because the officer told him, you can end the interview by just saying the word, it's as easy as that. To make his statements not coerced, he had to know that he didn't have to tell the officer what he wanted to hear if it wasn't the truth. He didn't have to tell him anything regardless. And we know that because, again, the officer says, you can end this at any time. He says he asks him permission to ask these questions. And he says, you know, he doesn't threaten him. He doesn't bribe him. There's no indication that Respondent didn't make these statements of his own free will. Counsel, if this Court should affirm the appellate court's judgment, are all of Respondent's statements inadmissible or merely just one statement which he admitted to hitting TW? If this Court were to affirm, we don't think that this Court should affirm. However, this Court needs to draw a line where the statement became custodial or became involuntary, yes. So, yes, this Court would have to watch the videos and say, you know, this is the point at which this interview became custodial or this is the point where Respondent's free will was overturned and he was now, you know, being coerced. And, you know, Respondent denies hitting the victim very early on in the first interview. So this Court would basically have to find that the entirety of both interviews were either custodial or coerced. And Respondent tries to not argue for a per se rule, but ultimately he is because, first of all, the first interview couldn't have been cleaner. I mean, the officer gave very simplified Miranda warnings, the most important Miranda warning that you can stop this at any time, just say the word, he understood it. So if this was a custodial interview, then any interview of a 9-year-old is custodial  because those are basically the two factors that Respondent relies upon. And Respondent also argues that the interview with the DCFS investigator was custodial, which, I mean, I think that further shows that he's ultimately asking for a per se rule here. The facts here, however, are unusual, we have to say. I mean, this child had been found to be abused a number of times, three abuse hotline calls, post-traumatic stress syndrome, having been diagnosed, having been repeatedly bullied, burned, and beaten by DECLAN. I mean, these are highly unusual facts. Yes, those are allegations that were made. Those are not Dr. Cuneo's, that's not his testimony, that's not the testimony of anyone at trial. Well, the doctor relied on that. The doctor noted those statements, yes. Right, so those were reports that the doctor reviewed in making his opinion. Yes, Your Honor. Yes, Your Honor. Yes, these are, this is, the facts of this case, thankfully, are quite unusual. However, these two statements don't change anything about those facts, and that's why any error in admitting them was harmless. I would also note that the consequences of eventual adjudication could be different for a respondent, depending on how old he is, and we would urge that the court resolve this case as quickly as possible. And for all the reasons stated, we ask that this court reverse the decision of the appellate court, reverse the judgment of the appellate court, and remand for proceedings. Thank you, Your Honors. Thank you. Case number 117341, Henry D. L. H., Jr., a minor, people of the State of Illinois, versus D. L. H., Jr., will be taken under advisement as agenda number eight. Mr. McLeish, Mr. Walker, we thank you for your arguments today, and you are excused at this time.